UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. ______

POWERBACK REHABILITATION, LLC,

*Plaintiff*,

v.

TAMMI NOKES,

*Defendant*.
_________________________________/

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff Powerback Rehabilitation, LLC ("Powerback" or "Plaintiff"), files this Complaint against Defendant Tammi Nokes ("Nokes" or "Defendant"). In support thereof, Powerback states as follows:

**INTRODUCTION**

1. This action is brought by Powerback to prevent its former employee, Nokes, from using the highly sensitive and confidential Powerback information she stole from Powerback to benefit herself and her new employer, Ovation Rehabilitation Services, LLC ("Ovation"), and from violating her post-employment contractual obligations to Powerback. After leaving Powerback, Nokes took extremely valuable, proprietary files belonging to Powerback which Powerback keeps strictly confidential. The files contain confidential information regarding Powerback's proprietary and

confidential customer contacts, meeting reports, and monthly metrics, which gives Powerback a substantial advantage over its competitors.

2. In fact, a forensic investigation conducted by Powerback showed that, approximately two weeks ***after*** Nokes employment relationship with Powerback ended, Nokes connected a USB device (Serial No. 5080471102345797836) to her Powerback laptop computer. Nokes then spent the next several hours transferring numerous files, many of which contain Powerback's confidential information, from Nokes' Powerback OneDrive account to the USB drive.

3. Powerback spent years developing its confidential and proprietary information, through acquisition of like-minded businesses to expand its network, and it is a cornerstone of Powerback's business plan. If Powerback's competitors, however, can simply use this confidential information from former Powerback employees who transferred such information from Powerback's computers and database, it would eliminate Powerback's competitive advantage, damage Powerback's relationship with its key stakeholders, and harm its reputation and goodwill in the marketplace.

4. Nokes had no legitimate, business reason for downloading and transferring the files to a USB from her Powerback OneDrive account after her employment with Powerback ended, continuing to access and use the files she downloaded and transferred, or sharing these files with a third party. These actions violated Nokes' confidentiality agreement with Powerback and were plainly intended to allow Nokes to use this information to benefit herself and her new employer, inflicting great harm on Powerback.

5. Nokes was entrusted with Powerback's trade secret, confidential, and/or proprietary business information, including, but not limited to: business plans, timelines, strategies, and customer and vendor information. Powerback invested a significant amount of time and resources in developing this information and business relationships, and the use and/or disclosure of this information would cause significant, irreparable harm to Powerback.

6. This action is based upon: (1) breach of contract; (2) misappropriation of trade secrets under the Florida Uniform Trade Secrets Act (Fla. Stat. Ch. 688) ("FUTSA"); (3) misappropriation of trade secrets under the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*) ("DTSA"); (4) breach of fiduciary duty and the duty of loyalty; and (5) tortious interference with business relations.

7. Powerback seeks the relief described herein, including interim injunctive relief, to enforce its contractual rights, protect its confidential information (including trade secrets), prevent Defendant from causing further irreparable harm to Powerback, and to recover damages inflicted by Defendant on Powerback's business and operations.

## THE PARTIES

8. Plaintiff Powerback is a leading national provider of rehabilitation therapy and wellness services, delivering unmatched expertise in Physical, Occupational, Speech-Language, and Respiratory therapies, as well as Applied Behavior Analysis (ABA). Powerback offers a variety of services for individuals and supports recovery, independence, and better living for adults in senior care settings and

at home. Powerback uses its proprietary and confidential information to help provide robust therapy management and compliance support at a competitive cost to ensure patients around the country receive quality care. Powerback is a Pennsylvania Limited Liability Company and has its corporate headquarters, and a principal place of business in Kennett Square, Pennsylvania.

9. Defendant Tammi Nokes is an adult individual whose last known address is 146 Savona Way, North Venice, Florida 34275, and on information and belief lives primarily in North Venice, Florida. At the time of her resignation from Powerback, Nokes worked as a Clinical Operations – Area Director for Florida and Georgia. After leaving Powerback, Nokes joined Ovation, a direct competitor with Powerback.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. Section 1836(c) and supplemental jurisdiction over Powerback's state law claims pursuant to 28 U.S.C. Section 1367.

11. Venue is proper in this District because the wrongful acts described in this Complaint occurred primarily in Sarasota County, Florida, which is located in this District.

12. This Court has personal jurisdiction over Nokes because she lives within this District, and the harm from Nokes' misconduct occurred within this District.

## FACTUAL ALLEGATIONS

### A. Powerback's Business

13. Powerback is the nation's leading provider of rehabilitation therapy and wellness services, delivering unmatched expertise in Physical, Occupational, Speech-Language, and Respiratory therapies, as well as Applied Behavior Analysis (ABA).

14. Powerback offers a variety of services for individuals and supports recovery, independence, and better living for adults in senior care settings and at home.

15. Powerback uses its proprietary and confidential information to help provide robust therapy management and compliance support at a competitive cost to ensure patients around the country receive quality care.

16. An integral part of Powerback's business is dependent on building and maintaining relationships with national partners, including through acquiring like-minded businesses to expand Powerback's footprint and ability to provide services to patients.

17. Powerback has expended considerable time, expense, and resources developing its network of partners throughout the United States in both the public and private sector.

### B. Powerback's Confidential and Trade Secret Information

18. Powerback has invested years of time and resources developing its proprietary and confidential information, including trade secrets, throughout its national network.

19. Powerback's confidential information provides a competitive advantage by offering quality rehabilitation services at a competitive market cost.

20. Powerback has created, at great time and expense, business strategies and roadmaps, pricing information, profits, margins, financial information, and customer and vendor information (including preferences and contact information, and curated compilations of such information), all of which are Powerback trade secrets.

21. These trade secrets are compiled and stored in Powerback databases and/or systems (including email systems) that are only accessible by Powerback's employees based on their roles.

22. Additionally, only certain Powerback employees are provided access to a Powerback Google Drive account. Nokes, as a Clinical Operations Area Director, was provided access to this Google Drive account so that they can store and share data belonging to Powerback only with certain employees, including the proprietary information referenced above. This information is intended to be shared only internally, and the permissions required to access these files are generally limited to Powerback employees. An employee accesses Powerback's Google Drive through a Powerback-owned account. Access to Powerback's Google Drive is limited to authorized Powerback employees and requires active Powerback employment/equipment to access.

23. In fact, Area Directors had access to certain folders that their direct reports did not.

24. Powerback derives significant value and advantage from the confidential and trade secret nature of its information. Powerback's confidential and proprietary information is critical to its ability to successfully compete in the marketplace, and provides Powerback a competitive advantage over its competitors.

25. A competitor's or other third party's use of these trade secrets would result in irreparable harm to Powerback. For example, it would allow a competitor to copy Powerback's business model and offer similar services at a better price, thereby diverting business from Powerback.

## C. Powerback's Efforts to Protect Its Confidential and Trade Secret Information

26. Powerback takes the protection of its information very seriously and expends a considerable amount of time and money to keep its information secure. At all relevant times, Powerback has taken extensive and reasonable steps to protect the confidentiality of its trade secrets and other confidential information. This includes:

a. Storing electronic documents on secure databases and systems, with access restricted to authorized employees of Powerback;

b. EndPoint detection tools – verifies that you are not being targeted for malware, verifies machines are encrypted, and can detect odd behavior;

c. Requiring compliance training; and

d. Requiring that a person accessing Powerback's systems or devices use a secure username/password.

27. Ensuring its commitment to protecting its confidential information, Powerback maintains a comprehensive Information Systems Security Policy regarding the Genesis system which outlines Powerback's commitment to safeguarding its internal company information as its highest commitment. The policy outlines key security expectations for all employees, which employees are required to renew understanding and training each year of employment.

a. The Information Systems Policy outlines security employees are to comply with and proactively practice to ensure the safety of Powerback's confidential information. Specifically, the policy requires employees to use a Multi-Factor Authentication (MFA) and never share credentials, in addition to informing employees to never share any passwords or user accounts. The policy further prohibits accessing data an employee does not need to do their job and using unauthorized software, devices, cloud storage, **or USB storage**. Importantly, the policy directs an employee to only use approved systems to store or send Company data. Moreover, the policy mandates employees lock their screen and secure devices when unattended. Employees are to report security concerns immediately.

b. As part of the User Security Policy and to ensure the protection of sensitive data, employees are again prohibited from using any personal USB devices. Such prohibition is a key security expectation to maintain the Company's confidential information is not shared.

c. Employees are also specifically prohibited from using unencrypted storage media and unauthorized hardware. Again, employees are explicitly prohibited

from using personal and/or unencrypted electronic storage devices – including USB thumb drives – for any Company-related business. Should an offline storage device, such as a USB be required for specific job duties, an employee must request a Company-supplied, hardware-encrypted USB key or external drive. At no time should an employee use a personal USB drive.

d. In Section 7, employees are provided explicit boundaries on what they can and cannot do with sensitive data belonging to the Company, which includes prohibiting an employee from storing confidential information and data on unapproved removable media such as unencrypted USB thumb drives.

e. Nokes completed and certified training on this policy as recently as September 28, 2025.

f. Moreover, Powerback employees are required to complete annual review and certification of the Company's Code of Conduct, attesting to compliance with the Code of Conduct. Specifically, employees, including Nokes, attest to the following:

> I understand how the Code of Conduct relates to my position with the company and agree to abide by all code requirements. I agree to report Code of Conduct violations that I become aware of in accordance with the reporting process. I acknowledge that my duty to make prompt disclosure is a vital part of my responsibilities and that the failure to report known or reasonably suspected improper conduct may be grounds for disciplinary action or termination. I acknowledge that as of this date, I have no knowledge of any transactions or events that appear to violate the Code of Conduct. A copy of the Code of Conduct has been made available to me.

28. Nokes attested to such certification in 2024 and again in 2025.

29. Additionally, Powerback provides employees with additional policies on how to safely and securely gain certain access to the Genesis Profile Management ("GPM"). This policy is meant to safeguard the Company's confidential information by ensuring employees are proactively seeking access to only those systems needed for their job.

a. This policy allows an employee to review or change their system access. For new hires, an employee will log on to the GPM system and search for the employee's identification number. Once selected, the employee is then presented with Profile Management Permissions, which shows the different systems the specific employee may access. If the employee wishes for further access, they must request such permission and may indicate the reason for such request. Those requests are then sent to the appropriate person for review and approval. In accordance with the policy, employees do not automatically gain access to every facet of the system but must proactively seek such permission to gain access.

30. In addition, Powerback requires its employees, including Nokes, to execute a confidentiality agreement as part of the onboarding process. A true and correct copy of the Confidentiality and Non-Solicitation Agreement that Nokes agreed to is attached and incorporated herein as **Exhibit 1** (the "Agreement").

a. In **Section 1(a)** of the Agreement, Nokes agreed, "The Company shall have sole proprietary interest in any and all confidential data or information that is important, competitively sensitive, and not generally known by the public, which

has been developed or obtained by Employee, the Company, its employees or clients, including but not limited to any and all commercial, financial or technical information, ideas, know-how, trade secrets, policies, reports, business plans, business methods, systems, manuals, agreements, performance statistics, supplier data, operational or administrative plans, confidential personnel information, client and/or customer (hereafter collectively "Client") lists, prospective Client lists, any information provided by a Client, prospective Client, or party to an agreement with the Company, or any other object or document developed for the Company's business." *See* Ex. 1.

b. In **Section 1(b)** of the Agreement, Nokes agreed, she "shall not, without the express written consent of an executive officer of the Company during the term of [] her employment and following [] her employment with the Company, disclose to any unauthorized third party or use any confidential information of the type set forth in Section 1 (a) above. [Nokes] agree[d] . . . not. . . [to] reproduce or photocopy any such documents or objects which contain, or are derived from, any such confidential information, nor take away any such information upon the termination of this Agreement, regardless of the cause of termination. Whatever is created or developed at work while in Company employ is the property of the Company." *Id.*

c. In **Section 4** of the Agreement, Nokes agreed that, "In consideration of [] her employment with Company, Employee also agrees that during his/her employment and for a period of one year following termination of employment (for any reason), Employee will not practice or otherwise work at any

facility or for any entity for which Employee provided services while an employee of Company within the last year of employment with the Company." *Id.*

d. In **Section 5(a)** of the Agreement, Nokes acknowledged "that the restrictions in the covenants set forth above are reasonably required to protect the Company[.]" *Id.*

**D. <u>Nokes' Employment with Powerback</u>**

31. On September 23, 2023, Nokes executed an offer letter with Powerback.

32. On September 23, 2023, Nokes also signed the Confidentiality and Non-Solicitation Agreement with Powerback. *See* Ex. 1.

33. Effective October 1, 2023, Nokes became a Powerback employee. *Id.*

34. As a Powerback employee, Nokes' role was the Clinical Operations – Area Director for Florida and Georgia. In this management role, Nokes was responsible for overseeing the efficient and profitable management of Genesis Rehab Services' operations. She was also responsible for marketing rehabilitation services in the region and monitoring the standards of clinical services being delivered and maintained in all sites of service.

35. On October 3, 2023, Nokes acknowledged her receipt of Powerback's Employee Handbook.

36. On October 29, 2025, Nokes verbally told Powerback's Regional Vice President of Operations Alicia McQuain ("McQuain") she was resigning from Powerback to care for her child and aging mother.

37. On October 29, 2025, Nokes formally submitted her resignation from Powerback with an effective date of December 1, 2025.

38. On November 7, 2025, a transition and introduction call was held with individuals from the Florida Department of Veterans Affairs ("VA")[1] and Powerback representatives to transition the matter from Nokes. During this call, the VA representative indicated that the Request for Proposal ("RFP") process had not started but that an update would be sent later.

39. On November 24, 2025, Nokes emailed her contacts at Waterman Village,[2] Kendra Criss ("Criss") and David Nwogu, informing them that Nokes was leaving Powerback and providing new Powerback leadership contact information to ensure a smooth transition.

40. The following day, on November 25, 2025, **Ovation Rehabilitation Services LLC**, Nokes' new employer, officially registered with the Florida Secretary of State (Division of Corporations). The initial filing lists Ovation Manager, Inc. as its managing member and identifies Linda Shackelford as its primary contact.

41. Nokes' employment with Powerback ended on December 1, 2025.

---

[1] Powerback and the VA previously entered into an Agreement, with several amendments, wherein Powerback provided its services to the VA with the latest expiration of the Agreement expiring on February 28, 2026.

[2] Waterman Village and Encore previously entered into an Agreement in 2021 for physical, occupational, and speech therapy. As part of the initial 1-year term, the Agreement would auto-renew unless 30-day notice was given. When Powerback acquired Encore in July 2023, an amendment to the Agreement became effective September 1, 2023.

42. On December 2, 2025, Nokes updated her LinkedIn profile to reflect her new job at Ovation as the Clinical Operations Area Director.

43. Because Nokes was still out on leave, she retained physical possession of her Powerback-issued computer. Nokes also retained access to her Powerback email address and OneDrive account.

44. On December 2, 2025, Powerback client The Pavilion Management Group ("Pavilion") provided notice of termination of its contractual relationship with Powerback even though the contract was set to expire on January 4, 2026.

45. On December 3, 2025, Kendra Criss (Nokes' contact at Waterman Village) emailed Nokes and Michael Shackelford ("Shackelford") at Ovation, stating "David is reviewing the contract so [Criss] ha[s] to cancel again."

46. Nokes responded to Criss' email indicating it was no problem but taking Shackelford off the email chain.

47. Upon realizing that Criss emailed Nokes' Powerback email address, Criss tried to recall her December 3 email.

48. On December 5, 2025, Ovation provided a presentation and response to the Florida VA's RFP.

49. On December 11, 2025, McQuain reached out to the Florida VA inquiring about the contracts and RFP process in February, when the current services contract with Powerback was set to expire.

50. This same day, contrary to the Florida VA's earlier representation that it would provide information about the RFP process, the Florida VA responded that it would not going forward with the RFP process but secured services through Ovation.

51. On December 12, 2025, Jeremiah Bodi with Ovation contacted McQuain requesting to speak with the Pavilion staff, which McQuain ultimately approved.

52. Then, on December 12, 2025, Criss informed Powerback that Waterman Village was going in a different direction and would be terminating its contract with Powerback on January 31, 2026.

**E. <u>The Scope of The Trade Secrets Nokes' Misappropriated Is Revealed</u>**

53. Prior to returning her laptop, Nokes connected a generic 128 GB USB storage device (Serial No. 5080471102345797836 and volume serial number 4C9E2983) to her Powerback-issued laptop on multiple occasions.

54. Artifacts on the work-issued computer showed that a folder named "COAD" with **almost 70 subfolders and 3,355 files** (over 4 GB of data) was saved over about a 5-hour period to the USB drive on December 15, 2025 by a user logged in under the "tammi.nokes" user account. "COAD" is also the name of a folder in Nokes' corporate OneDrive issued to her at PowerBack. Artifacts on the computer are limited to files/folders interacted with post-copy: iDS' analysis showed some (but not necessarily all) of the files/folders that were copied to the USB drive.

55. Nokes failed to return the USB[3] or any electronic files, and she has not returned any of the files she accessed from non-Powerback devices or accounts.

56. Upon learning of Nokes' downloading and transferring of Powerback's confidential information, Powerback demanded Nokes return the USB device to Powerback.

57. On April 16, 2026, Powerback's computer forensic expert received a USB drive from Nokes' counsel. This USB drive was determined to be the same USB drive that was connected to Nokes' work-issued laptop computer, as it had the same serial number and volume serial number as the USB inserted into Nokes' work-issued computer. The USB contained a folder named "COAD" and over 3,300 files were in that folder. Artifacts on the USB drive itself (temporary Microsoft Office files) indicated that at least four files were opened from the USB drive ***after*** it was inserted into the work-issued computer on December 15, 2025 (and well after she started her employment with Ovation):

- On December 16, 2025, someone opened a spreadsheet named "Copy of 810 customer contacts (002).xlsx" from the USB;
- On January 12, 2026, someone opened a spreadsheet named "FDVA Therapy Monthly Meeting Report (2).xlsx" from the USB; and
- On February 10, 2026, someone opened files named "Dysphagia Presentation .pptx" and "Monthly Metrics - Area 12.xlsx" from the USB.

[3] Over four (4) months after the end of her employment, Nokes finally returned the USB only after multiple letters and requests from Powerback.

58. The "Copy of 810 customer contacts (002).xlsx" spreadsheet is a document that Area Directors commonly create to keep a list of the customers that they were responsible for at Powerback. This spreadsheet is a list of the customers that Nokes was responsible for at Powerback. All of these customers have terminated their relationship with Powerback. Ovation now services all of the Pavilion and VA sites listed on this spreadsheet.

59. The "FDVA Therapy Monthly Meeting Report (2).xlsx" is an overview that Nokes provided either internally or to the customer showing Powerback's performance in servicing the customer, which is the Florida VA. This shows the profit the customer is receiving from the therapy Powerback provides. This information is confidential and not available to the public. A competitor could use this information to undercut Powerback's fees that are charged to the customer under the Therapy Expense rows. A competitor could use this to gain insight into the volume of therapy Powerback provides to the customer. It is not common practice for a prospective customer to disclose this information.

60. The "Dysphagia Presentation .pptx" is a PowerPoint that Nokes likely created to train the customer's nursing staff about Dysphagia.

61. The "Monthly Metrics - Area 12.xlsx" is a spreadsheet. Area 12 is the area assigned to Nokes. This spreadsheet shows Powerback's 2024 gross margin for each customer's facility in Area 12. This spreadsheet also shows the volume of therapy that Powerback provides. Specifically, Powerback's productivity, i.e., the amount of time we bill for patients versus the amount of cost associated with the labor. It also

shows how often Pwerback can see patients together to help manage labor and expense as well as the billable time spent in doing mode of delivery, which indicates Powerback's profit margins and how it operates its therapy department. This is highly confidential financial information that is not available to the public.

62. Nokes' work-issued computer did not contain forensic artifacts indicating that these four files were opened on these dates/times from a USB drive, therefore, these files were opened on one or more computers separate and distinct from Nokes' work-issued computer.

63. Nokes' conduct is a clear breach of her Agreement, as set forth below, as Nokes had taken extensive steps to steal Powerback's information, continued to access that information after her separation from Powerback, and proceeded to open that information during her employment with Ovation.

64. The circumstances of Nokes' hiring by Ovation further confirms that Nokes used or intends to use the Powerback confidential information and trade secrets she stole to benefit herself and Ovation.

65. Further, since Nokes' departure, Powerback suddenly experienced multiple customers that Nokes worked with for Powerback backing out of contracts with Powerback to use Ovation and Ovation's services. To date, all but one of the customers Nokes was responsible for have terminated their contracts with Powerback.

66. Upon information and belief, Nokes is using Powerback's confidential and trade secret information to aggressively solicit these customers to contract with and/or divert them to Ovation. This is especially odd since Ovation was not even

registered to do business within the State of Florida until after Nokes' verbal resignation and mere days before her resignation became effective and Nokes' employment with Ovation began.

67. Nokes' actions are intentional, willful, and malicious.

68. Nokes is causing Powerback irreparable harm and injury, including without limitation, the loss of clients, profits, business reputation, market share, the disclosure and misuse of trade secret, confidential and/or proprietary business information, and loss of goodwill. These losses will continue if the Court does not enjoin Nokes' actions.

## COUNT I
## BREACH OF CONTRACT

69. Powerback incorporates by reference the allegations of the preceding paragraphs as though set forth fully herein.

70. The Agreement is an enforceable contract between Nokes and Powerback.

71. Powerback has satisfied all of its obligations under the terms and conditions of the above-referenced agreements that it was required to perform, and Nokes' performance of her obligations under these agreements was not excused.

72. Nokes breached the Agreement by taking, failing to return, using and disclosing Powerback's confidential information, including as set forth above.

73. Nokes breached the Agreement by soliciting Powerback's customers.

74. As a direct and proximate result of Nokes' breaches, Powerback has suffered damage, in an amount to be proven at trial. Further, Powerback will continue to be directly and proximately damaged and irreparably harmed if Nokes is not enjoined from further violation of her contractual obligations to Powerback. Powerback does not have an adequate remedy at law and will not be fully compensated for Nokes' breaches without injunctive relief.

## COUNT II
## MISAPPROPRIATION OF CONFIDENTIAL INFORMATION AND TRADE SECRETS – VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT

75. Powerback incorporates by reference the allegations of the preceding paragraphs as though set forth fully herein.

76. While employed by Powerback, Nokes obtained access to Powerback's trade secret information, including its clients, customers, suppliers, methods of doing business not limited to competing with Powerback's competition, costs, billings, and supporting documents.

77. Powerback has taken reasonable steps to maintain the confidential nature of this information, including through the use of confidentiality agreements and password-protected databases. This information is not available to the public and would be valuable to a competitor. Further, Powerback's trade secrets derive economic value from not being readily ascertainable by others in the industry.

78. Nokes misappropriated Powerback's trade secrets through the wrongful conduct identified above, including by wrongfully acquiring and retaining that

information after her employment ended and using it on behalf of herself and her new employer.

79. Nokes' conduct also constitutes a threat to continue misappropriating Powerback's trade secrets.

80. On information and belief, Nokes has and will continue to misappropriate, disclose, and use for her benefit and to Powerback's detriment, Powerback's trade secret information unless she is enjoined from doing so.

81. Because Powerback's remedy at law is inadequate and it will suffer irreparable harm, Powerback seeks—in addition to damages—a permanent injunction to protect its confidential and trade secret information and legitimate business interests. Powerback will continue to suffer irreparable harm absent injunctive relief.

82. Nokes' misappropriation of Powerback's trade secret information has caused and will continue to cause substantial injury, including but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets. Nokes has also been unjustly enriched by her misappropriation of Powerback's trade secrets.

83. Nokes' misappropriation of Powerback's trade secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive. Nokes misappropriated Powerback's trade secrets intentionally and knowingly and with a deliberate intent to benefit herself and injure Powerback. Accordingly, Powerback is entitled to damages, in an amount to be determined at trial, as well as injunctive relief, and an award of punitive and attorney's fees.

## COUNT III
## MISAPPROPRIATION OF CONFIDENTIAL INFORMATION AND TRADE SECRETS – VIOLATION OF THE DEFEND TRADE SECRETS ACT- 18 U.S.C. § 1836

84. Powerback incorporates by reference the allegations of the preceding paragraphs as though set forth fully herein.

85. While employed by Powerback, Nokes obtained access to Powerback's trade secret information, including its clients, customers, suppliers, methods of doing business not limited to competing with Powerback's competition, costs, billings, and supporting documents.

86. Powerback has taken reasonable steps to maintain the confidential nature of this information, including through the use of confidentiality agreements and password-protected databases. This information is not available to the public and would be valuable to a competitor. Further, Powerback's trade secrets derive economic value from not being readily ascertainable by others in the industry.

87. Nokes misappropriated Powerback's trade secrets through the wrongful conduct identified above, including by wrongfully acquiring and retaining that information after her employment ended and using it on behalf of herself and her new employer.

88. Nokes' conduct also constitutes a threat to continue misappropriating Powerback's trade secrets.

89. On information and belief, Nokes has and will continue to misappropriate, disclose, and use for her benefit and to Powerback's detriment, Powerback's trade secret information unless she is enjoined from doing so.

90. Because Powerback's remedy at law is inadequate and it will suffer irreparable harm, Powerback seeks—in addition to damages—a permanent injunction to protect its confidential and trade secret information and legitimate business interests. Powerback will continue to suffer irreparable harm absent injunctive relief.

91. Nokes' misappropriation of Powerback's trade secret information has caused and will continue to cause substantial injury, including but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets. Nokes has also been unjustly enriched by her misappropriation of Powerback's trade secrets.

92. Nokes' misappropriation of Powerback's trade secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive. Nokes misappropriated Powerback's trade secrets intentionally and knowingly and with a deliberate intent to benefit herself and injure Powerback. Accordingly, Powerback is entitled to damages, in an amount to be determined at trial, as well as injunctive relief, and an award of punitive and attorney's fees.

## COUNT IV
## BREACH OF FIDUCIARY DUTY & DUTY OF LOYALTY AGAINST DEFENDANT NOKES

93. Powerback incorporates by reference the allegations of the preceding paragraphs as though set forth fully herein.

94. As an employee of Powerback, Nokes owed Powerback fiduciary duties, including a duty of loyalty. As a result, she was obligated to act with the utmost good faith and in the best interest of Powerback.

95. Powerback was entitled to place its trust and confidence in Nokes and was entitled to expect Nokes to act with the utmost good faith toward it in carrying out the business of Powerback.

96. Powerback relied on Nokes' loyalty and integrity and faithful performance of her job duties and responsibilities.

97. Through the actions set forth above, Nokes knowingly and willingly breached her fiduciary duties to Powerback.

98. This claim is not predicated on the misappropriation or theft of any confidential, proprietary and/or trade secret information belonging to Powerback. Rather, it is predicated on Nokes' deceit and breach of her duties of loyalty.

99. Powerback is entitled to damages, in an amount to be determined at trial, as well as disgorgement by Nokes of the salary, benefits and other forms of remuneration paid to her during the time that she was, in secret, being disloyal to Powerback, and all profits she and/or her new employer received as a result of her disloyalty, in an amount to be determined at trial.

100. Nokes' actions were done with malice, fraud, oppression, and reckless disregard of the above-described rights of Powerback. Therefore, Powerback seeks and is entitled to recover punitive damages from Nokes.

## PRAYER FOR RELIEF

WHEREFORE, Powerback respectfully requests this Court enter an Order:

a. Permanently enjoining Defendant from disclosing any of Powerback's trade secret, confidential, and/or proprietary business information, or using such information to benefit herself or any third party;

b. Directing Nokes to return all Powerback information, documents, data, files, and materials, including electronically stored information, in Nokes' possession, custody, and/or control;

c. Directing Nokes to participate in a forensic remediation process, conducted by a Court-appointed forensic neutral and at Nokes' expense, to insure that all of Powerback's information is returned to Powerback and securely removed from Nokes' possession, custody, or control;

d. Permanently enjoining Defendant from soliciting Powerback's customers;

e. Prohibiting Nokes from working with any Powerback customers or prospective customers that Nokes previously worked with, received confidential information about, or took confidential about;

f. Awarding damages for Defendant's wrongful conduct, according to proof at trial;

g. Awarding treble damages for Defendant's wrongful conduct, according to proof at trial;

h. Awarding punitive damages for Defendant's wrongful conduct, according to proof at trial;

i. Awarding Powerback its reasonable attorneys' fees, costs, and expenses, as well as pre-and post-judgment interests; and

j. Granting such other and further relief as the Court may deem just, equitable, and proper.

Dated: August 19, 2026

LITTLER MENDELSON P.C.

*/s/ Tyler A. Sims*
Tyler A. Sims, Esq.
Florida Bar No. 1048908
tsims@littler.com
111 North Orange Avenue, Suite 1750
Orlando, FL 32801.2366
Tel: 407.393.2900
Fax: 407.393.2929

Attorneys for Plaintiff